UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GINA VALADE and DAVID VALADE,

                      Plaintiffs,

          -v-

CITY OF NEW YORK, THE NEW YORK
POLICE DEPARTMENT, POLICE OFFICER
EVRODY SEIDE and POLICE OFFICERS
JOHN AND JANE DOE #1-10,

                    Defendants.

------------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/6/13

No. 10 Civ. 2831 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

    Gina Valade and David Valade bring this civil rights action alleging claims of false arrest, unlawful strip search, excessive force, sexual assault and malicious prosecution against the City of New York, the New York City Police Department, Police Officer Evrody Seide and ten unidentified police officers. Before the Court is Defendants' motion for summary judgment. For the reasons that follow, summary judgment is granted as to each of Plaintiffs' claims except for Ms. Valade's excessive force and sexual assault claims against Officer Seide.

## BACKGROUND[1]

On the evening of April 10, 2009, Mr. Valade left work with a group of co-workers and walked to a bar called the Crooked Knife.  (D. Valade Tr. 76.)  There, Mr. Valade had a "selection of bar food," "some water" and "four or five" glasses of hard cider," an alcoholic beverage "similar to a beer."  (Id. 78.)  Ms. Valade eventually joined Mr. Valade at the Crooked Knife sometime between 7:00 p.m. and 9:00 p.m.  (Id. 79; G. Valade Tr. 101.)

Shortly after Ms. Valade's arrival, the Valades and two friends left the Crooked Knife and walked to a nearby restaurant called "L'Artisanal."  (D. Valade Tr. 80-81.)  Waiting for a table, the group sat at the bar and shared a bottle of champagne and a cheese plate.  (Id. 81.)  Once seated, the group "ordered another bottle of wine and . . . all shared it as well."  (Id. 86.)  Mr. Valade also "possibl[y]" had some cognac "at the end of dinner with coffee"; Ms. Valade thinks she "had a sambuca with dessert."  (Id. 106; G. Valade Tr. 101.)

The group left L'Artisanal late, "between 11:00 and probably midnight," and "walked down the street to a place called Desmond's Tavern."  (D. Valade Tr. 85.)  There, they ordered another round of drinks.  (Id. 89.)  Mr. Valade drank half of his beer, but did not finish it because

---

[1]     The following facts are undisputed unless otherwise noted.  They are drawn primarily from the Declaration of Sumit Sud in Support of Defendants' Motion for Summary Judgment ("Sud Decl.") and exhibits attached thereto; the Declaration of Gregory Mouton in Opposition to Defendants' Motion for Summary Judgment ("Mouton Decl.") and exhibits attached thereto; and the Declarations of Defendant Evrody Seide ("Seide Decl.") and Michael McIntosh ("McIntosh Decl.").  The Court notes that Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement does not conform to Local Rule 56.1.  A number of paragraphs in Plaintiffs' submission do not admit or dispute the facts set forth in Defendants' submission but merely object that those facts are "immaterial" to Defendants' motion.  (See Pls.' 56.1 ¶¶ 3-4, 6-9, 35-36.)  Other paragraphs dispute Defendants' representations but fail to provide admissible evidence to the contrary.  (See id. ¶¶ 10-13, 22, 27.)  Plaintiffs' submission further contains extensive and unhelpful citation to case law.  (See id. ¶¶ 10-14, 17-31, 34, 37-38, 43-48, 50-53, 55-58, 60.)  The purpose of Local Rule 56.1 is "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001).  That purpose was not served here.  Nonetheless, while the Court notes that it is not obligated to "perform an independent review of the record to find proof of a factual dispute," Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002), the Court, in the interest of fairness to the litigants, has done so here.

he "was very tired by that point and kept falling asleep." (Id. 89.)  Mr. Valade testified that he did not feel intoxicated; Ms. Valade testified that she "had a lot to drink." (Id. 92; G. Valade Tr. 112.)

**The Cab Ride**

The Valades left Desmond's Tavern, and shortly after 1:00 a.m., at the corner of 29th Street and Park Avenue South, the Valades hailed a cab driven by Ahmed Shaban. (D. Valade 91-92; Sud Decl. Ex. H.)  The Valades got in the back seat and Mr. Valade "g[a]ve the cabby the directions to go home, and [he] fell asleep." (D. Valade Tr. 92.)  When Mr. Valade woke up, "the cab was stopped at 34th and 3rd, approximately, and [Mr. Shaban] was insisting [the Valades] were at [their] destination and that [they] get out." (Id. 95.)  According to an audio statement provided by Mr. Shaban, he told the Valades they "had to leave the car" because they were cursing at him, but that "they refused to leave the car." (Sud Decl. Ex. L.)

Mr. Valade testified that Mr. Shaban became "very excited and . . . abusive" during the ensuing discussion. (D. Valade Tr. 100.)  The Valades told him that they "weren't at [their] desired location" and "wanted to be taken home . . . and not left on the side of the street in the middle of the night" and "weren't getting out of the cab until the dispute was resolved." (Id. 97; G. Valade 115.)  Mr. Shaban exited the cab, "leaned up against the trunk" and "called 911." (D. Valade Tr. 98; G. Valade Tr. 118; Sud Decl. Ex. L.)

After "quite a long time" in the back of the cab, at least ten minutes, Mr. Valade "got out of the back seat passenger side," "opened the passenger side front seat car door" and sat in the front seat for a few moments because he "felt it might encourage [Mr. Shaban] to get back in the cab." (D. Valade Tr. 98, 101.)  Mr. Shaban stated that while Mr. Valade was in the front passenger seat, he "slid[] to the driver's seat . . . [to] try[] to take off with the car" and, in doing

3

so "br[oke] the cigarette lighter" on the cab's console.  (Sud Decl. Ex. L.)  Mr. Valade, by contrast, testified that he did "[n]othing" while he was in the front seat and made no attempt to damage the cab in any way.  (D. Valade Tr. 102; G. Valade Tr. 122.)  According to Ms. Valade, "as soon as [Mr. Valade] got in the front seat," Mr. Shaban "started cursing at him" at which point Mr. Valade voluntarily exited the front seat and returned to the back seat.  (G. Valade Tr. 122.)

Upon returning to the back seat, Mr. Valade called 311 "to file a complaint."  (D. Valade Tr. 104-107.)  After placing the call, the Valades "sat there and waited" "in shock."  (Id. 106-107.)

### The Arrest

Officer Seide and her partner, Officer Michael McIntosh, arrived on the scene in response to a radio call reporting a "possible crime in progress . . . involving an intoxicated passenger in a taxi."  (Seide Decl. ¶ 5) (emphasis and brackets removed).  Upon their arrival, Mr. Shaban informed them that the Valades became disruptive during the course of the cab ride, refused to pay the fare and that Mr. Valade had entered the front of the taxi and damaged the cab's front console.  (Id. ¶¶ 7, 9-12.)  Officer Seide "observed a piece of the broken ashtray from the front consol[e] of the taxi."  (Id. ¶ 13.)  Mr. Shaban also provided Officer Seide with the receipt for the cab ride, which reflects that the cab traveled 0.04 miles and that the meter started at 1:12 a.m. and stopped at 1:48 a.m., resulting in a charge of $17.40.  (Id. ¶ 23; Sud Decl. Ex. H.)

Officers Seide and McIntosh asked the Valades to step out of the back of the cab.  Mr. Valade testified that they complied.  (D. Valade Tr. 108-09.)  Officer Seide, by contrast, contends that they did not comply, despite her multiple requests, until Officer McIntosh ordered them to exit the cab.  (Seide Decl. ¶¶ 15-16.)  Officer McIntosh testified that Mr. Valade "had

difficulty standing up straight" and both officers stated that both Valades appeared "highly intoxicated." (Id. ¶ 19; McIntosh Decl. ¶¶ 11-12.)  Officer McIntosh "could smell a strong odor of alcohol coming from both their persons, their eyes were red, and their speech was slurred." (McIntosh Decl. ¶ 11.)

The officers separated Mr. and Ms. Valade.  (D. Valade Tr. 108.)  Mr. Valade and Officer Seide "had a conversation" during which Officer Seide "kept insisting that [he] pay the cab fare, and [he] kept insisting that the cab driver was not taking [them] to where [they] were asking to be taken, and [they] did not wish to be dropped out in the street in the middle of the night." (Id. 108.)  Mr. Valade then "proceeded to shove [Officer Seide] and told [her] to 'go fuck [her]self.'" (Seide Decl. ¶ 18; McIntosh Decl. ¶ 14.)

The officers told the Valades "to pay the fare several times and find another taxi to take them home." (Seide Decl. ¶ 17; McIntosh Decl. ¶ 10; G. Valade Tr. 143.)  The Valades refused to pay the fare, and Mr. Valade told the officers he believed the fare amount to be incorrect by "pointing to the bar and saying, we just came from right there . . . it does not cost 17.50 to go . . . two blocks in a cab." (D. Valade Tr. 97, 112; G. Valade Tr. 144-45.)

At that point, Officers Seide and McIntosh "determined that there was probable cause to arrest David Valade for Theft of Services (N.Y. Penal Code § 165.15) and Criminal Mischief (N.Y. Penal Code § 145.01) [sic] and to arrest Gina Valade for Theft of Services." (Seide Decl. ¶ 20.)  The Valades were handcuffed and placed under arrest. (Id. ¶ 21; D. Valade Tr. 112, 115; G. Valade Tr. 140.)

Although Ms. Valade "was having a difficult time processing what was happening," she recalled that Officer Seide handcuffed her. (G. Valade Tr. 140-41.)  Ms. Valade told Officer Seide "[m]ore than once" that "she was hurting [her]" and that "the handcuffs are too tight." (Id.

141, 149.)  Officer Seide responded by "insinuat[ing] that [Ms. Valade] was being a sissy or something of that [i]lk."  (<u>Id.</u> 141.)  Ms. Valade suffered a "scratch on [her] [left] wrist from where [the handcuffs] had kind of dug into [her]."  (<u>Id.</u> 167; Mouton Ex. 3.)

Officer Seide next "shoved [Ms. Valade] into the car," a process Ms. Valade described in her deposition as follows:

> Q.    And where were you then, what happened next?
> A.    She shoved me into the car.
> Q.    And can you describe the shove into the cab, please[?]
> A.    She grabbed my arm very roughly like this.  (Indicating.)  And started shoving me. . . . And she was grabbing me, and she threw me off balance, and I was having a hard time getting in the car.  I was afraid I was going to bump my head.  And she said something nasty to me like – come on already, or, get in there.  And I'm like, I'm trying.  But – she was pushing me around, so I couldn't get my balance.  And I was handcuffed, and so I was – having a hard time getting into the back seat of the car.
> Q.    How many times did she shove you?
> A.    Well, she was kind of roughing me with the arm.  And then – at least – at least twice. . . . Once when she pushed me off balance, and once when she was shoving me actually into the car. . . .
> Q.    And were you injured as a result of those two shoves?
> A.    I have a large bruise on my back.
> Q.    Do you believe the bruise was a result of the shoves?
> A.    Yes.[2]

(G. Valade Tr. 147-48.)  Ms. Valade submitted a photograph depicting the bruise, which lasted six weeks.  (<u>Id.</u> 303; Mouton Ex. 4.)

Mr. Valade, who does not claim to have been physically harmed during his arrest, did not witness any officer verbally abuse or physically harm his wife during her arrest.  (D. Valade Tr. 114, 116.)  Officer Seide asserts that "[n]o force was used to effectuate the arrest of Mr. or Mrs. Valade."  (Seide Decl. ¶ 22.)

---

[2]    Ms. Valade later clarified that she couldn't say "definitively 100 percent" that the bruise was a result of the shoving.  (G. Valade Tr. 296.)

*The Precinct*

The Valades were transported to the 17th Precinct and placed in separate holding cells. (Seide Decl. ¶¶ 24-26; D. Valade Tr. 120.)  Officer Seide avers that Ms. Valade "was alone in her holding cell . . . and no one entered her cell on April 11, 2009." (Seide Decl. ¶ 28.)  At some point, however, according to Officer Seide, the following events transpired: Ms. Valade, who was "highly intoxicated and was yelling incoherently," "requested to use the bathroom." (Id. ¶¶ 27, 29.)  Officer Seide accompanied Ms. Valade to the bathroom, where "after using the bathroom, she began to struggle with putting her girdle/Span[x]³ back on." (Id. ¶ 30.)  Officer Seide "provided [Ms.] Valade with a chair, where she continued to try to put the girdle/Span[x] back on." (Id. ¶ 31.)  Officer Seide "then informed her that she had the option of taking [the Span[x]] off and that she could take [them] to Central Booking" at which point Ms. Valade "removed her girdle/Span[x] and [Officer Seide] placed [them] on the filing cabinet in front of her cell, and placed [Ms. Valade] . . . back in her cell." (Id. ¶¶ 32-33.)

Ms. Valade remembers none of the foregoing events at the precinct.  Her next memory after getting into the police car was "being woken up in the jail cell" by Officer Seide, feeling "groggy," "confused" and "out of sorts." (G. Valade Tr. 154, 161-62, 166.)  There was no one else in her cell at that time, and Ms. Valade was wearing her dress, shoes, sweater, shirt and underwear. (Id. 162, 169, 179.)  Officer Seide picked up Ms. Valade's Spanx and "shoved them through the bars and told [her] to put them on." (Id. 162-63.)

Ms. Valade put her Spanx back on in the bathroom. (Id. 171.)  There, Ms. Valade felt her "anus hurt . . . when [she] was wiping"—"like an aching pain" as "if somebody punched you in

---

³       Ms. Valade testified that the Spanx she wore are a type of "body shaper [that] went from [her] lower ribcage . . . all the way down to the tops of [her] thighs." (G. Valade Tr. 163.)

the arm, that kind of pain." (Id. 172.) She also noticed "blood and a funny discharge," which she described as a "milky white," "slimy," "jelly-like," "alien substance." (Id. 179, 188-89.)

***Ms. Valade's Hospital and Doctor's Visits***

At approximately 3:30 a.m., the officers took the Valades to central booking. (Seide Decl. ¶ 36; McIntosh Decl. ¶ 18.) While at central booking, Ms. Valade informed Officer Seide that she needed to take medication for her bipolar disorder. (G. Valade Tr. 196.) At approximately 4:15 a.m., Officers Seide and McIntosh then drove Ms. Valade to Bellevue Hospital. (Id. 200; Seide Decl. ¶ 39.) Ms. Valade was released from Bellevue without treatment at approximately 7:00 a.m., and Officer Seide transported her to another precinct for holding. (Seide Decl. ¶ 40.) Ms. Valade was eventually released and met back up with Mr. Valade and went home. (G. Valade Tr. 228.)

Ms. Valade was still experiencing rectal pain when she got home and saw her primary care physician, Dr. Malachovsky, on April 15, 2009. (Id. 238.) Ms. Valade told him that her back hurt and "about the blood in the discharge and the pain." (Id.) Dr. Malachovsky's "provider notes" on Ms. Valade's medical report prepared in connection with her April 15, 2009 visit state, in part, as follows:

> [P]t [i.e., Patient] states that on Saturday April 11th was in a taxi cab and was charged too much for a six block ride. [W]as there with her husband. [P]olice was called. [S]tates that very drunk and her husband as well. [T]here was some arguing and they refused to pay. [W]ere handcuffed and brought to police station. [P]t states she does not remember much but that next morning she realized she had some discharge of [] lubricant and a little bit of blood in underpants. [B]elieves she was stripsearched and cavity searched. [D]ischarge or blood did not return or persist. [H]as a bruise on her back and her left wrist has a slight mark. [H]er L hand hurts a little bit and her lower back is hurting her. [P]t also experiences intermittent nausea, dizziness and lightheadidiness [sic] and is constantly thirsty. [H]as a mild headache in the front.

(Sud Decl. Ex. E.)  The report also notes a "4x5 cm bruise over L lateral flank area . . . mild tenderness over the bruise" and "mild tenderness . . . [in] L hand."  (Id.)[4]

### Legal Proceedings

The New York County District Attorney's Office drafted criminal complaints against the Valades, which Officer Seide read and signed.  (Seide Decl. ¶¶ 43, 45.)  After signing the complaints, Officer Seide had no further contact with the District Attorney's Office.  (Id. ¶ 46.) Ms. Valade accepted an adjournment in contemplation of dismissal.  (Sud Decl. Ex. N.)  Mr. Valade was arraigned on one count of theft of services and one count of criminal mischief.  (Id. Ex. P.)

The complaint against Mr. Valade was dismissed on July 13, 2009.  (Sud Decl. Ex. P.) The complaint against Ms. Valade was dismissed on October 9, 2009.  (Id. Ex. N.)  The Valades initiated this action on March 31, 2010.  (Dkt. 1.)  Following discovery, Defendants filed the instant motion for summary judgment on September 24, 2012.  (Dkt. 35.)

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact."  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

---

[4]     Dr. Malachovsky's report also states: "obgyn evaluation is advised and pt state[s] that she will be making appt with obgyn."  (Sud Decl. Ex. E.)  The Court finds no record evidence indicating that Ms. Valade made such an appointment.

**DISCUSSION**

The Complaint alleges claims for false arrest, unlawful strip search, excessive force, sexual assault and malicious prosecution.  The Court will address each of these claims in turn as they apply to each Defendant.

**1.  Officer Seide**

    **a.  False Arrest**

"Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him [or her] without his [or her] consent and without justification."  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted).  "The existence of probable cause to arrest," however, constitutes such justification and "is a complete defense to an action for false arrest."  Id.

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) (internal quotation marks omitted).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers."  Weyant, 101 F.3d at 852.

The summary judgment record demonstrates the existence of probable cause to arrest the Valades for theft of services and to arrest Mr. Valade for criminal mischief.

      **i.  Theft of Services**

Under New York Criminal Law § 165.15(3)

A person is guilty of theft of services when . . . with intent to obtain . . . taxi or any other public transportation service without payment of the lawful charge therefor, or to avoid payment of the lawful charge for such transportation service which has been rendered to him, he obtains or attempts to obtain such service or

avoids or attempts to avoid payment therefor . . . by unjustifiable failure or refusal to pay.

Officer Seide avers in her declaration that, upon arriving at the scene, after responding to a radio call regarding a possible crime in progress, she was informed by Mr. Shaban that the Valades became disruptive during their cab ride and then refused to pay the metered fare. Plaintiffs make no suggestion that the officers had reason to doubt Mr. Shaban's veracity. See Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) ("[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity."). It is further undisputed that Officers Seide and McIntosh asked the Valades to pay the cab fare "on several occasions" and that they refused to do so. Such evidence supports probable cause to arrest for theft of services.

Plaintiffs argue that probable cause was lacking because the officers did not first determine that the cab fare was lawful, that Plaintiffs acted with wrongful intent and that Plaintiffs unjustifiably refused to pay. (Opp'n 3-5.) In so arguing, Plaintiffs "incorrectly assume that an officer must have proof of each element of a crime and negate any defense before an arrest." Finigan v. Marshall, 574 F.3d 57, 63 (2d Cir. 2009). Rather, the law is clear that "police officers are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Coons v. Casabella, 284 F.3d 437, 441 (2d Cir. 2002) (internal quotation marks omitted); see also Puckowitz v. City of N.Y., No. 09 Civ. 6035 (PGG), 2010 WL 3632692, at *3 (S.D.N.Y. Sept. 17, 2010) (dismissing false arrest claim arising from cab fare dispute and noting that officers "were not obligated to investigate [plaintiff's] claims of innocence, nor to pursue his suggestions for investigating the charge").

### ii. Criminal Mischief

Under New York Criminal Law § 145.00(1), "[a] person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she . . . [i]ntentionally damages the property of another person." Officer Seide's direct observation of the damaged taxi cab console, coupled with Mr. Shaban's representation that Mr. Valade entered the front seat and caused such damage, provided probable cause to arrest Mr. Valade for criminal mischief. See Fabrikant, 691 F.3d at 216.[5]

Accordingly, Plaintiffs' false arrest claims are dismissed.

### b. Unlawful Strip Search

Ms. Valade argues that Officer Seide subjected her to an unlawful strip search.[6] (Opp'n 10.) However, Ms. Valade has failed to produce any evidence that she was strip searched at all, let alone unlawfully so. At her deposition, Ms. Valade was unable to testify even that she *believed* she was strip searched.

> Q. Is it your belief that you were striped searched [sic] while in police custody?
> A. I don't remember, but I do know that I probably had – I got to tell you, I don't really know. Somehow my clothes came off and I would have never taken them off myself.

(G. Valade 230.) Such speculation is precisely the sort that courts have deemed insufficient to defeat a summary judgment motion, see, e.g., Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998), especially so when balanced against Officer Seide's testimony that Ms. Valade undressed herself before using the bathroom. See Thomas v. City of N.Y., No. 11 Civ. 2219 (LAP)

---

[5] Plaintiffs suggest that the officers did not speak to Mr. Shaban until after the arrest. (Opp'n 6-7.) There is no dispute in the record, however, that the officers spoke to Mr. Shaban before arresting the Valades. Mr. Valade's testimony that, after the Valades "we were put into the back of the police vehicle . . . [he] believe[d] they [the officers] had a conversation with the cab driver," (D. Valade Tr. 109), has no bearing on whether the officers also spoke with Mr. Shaban before the Valades were arrested.

[6] The Complaint does not allege that Mr. Valade was unlawfully strip searched. (See Compl. ¶ 52.)

(GWG), 2013 WL 1325186, at *11 (S.D.N.Y. Apr. 2, 2013) (summary judgment warranted on unlawful strip search claim absent evidence that strip search occurred); Caidor v. Harrington, No. 05 Civ. 0297 (GTS) (GJD), 2009 WL 174958, at *4 (N.D.N.Y. Jan. 26, 2009) (granting summary judgment where "the Court c[ould] find no admissible record evidence that any such strip search even occurred").

Ms. Valade's unlawful strip search claim is therefore dismissed.

**c.  Excessive Force**

The Supreme Court acknowledges that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).  Accordingly, it has made clear that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (citation omitted). The Second Circuit has recognized, however, that the question of whether an officer's use of force was excessive is often a question unsuitable for summary adjudication. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.").

Law enforcement officials' application of force is excessive if it is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.  Ms. Valade alleges that police used excessive force when Officer Seide handcuffed her and when Officer Seide "shoved" her into the police car.[7]  The Court addresses each instance in turn.[8]

---

[7]        Plaintiffs concede that Mr. Valade does not have a viable excessive force claim.  (Opp'n 11.)

### i.  Handcuffing

While, of course, "to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out," Esmont v. City of N.Y., 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citation omitted), "overly tight handcuffing can constitute excessive force." Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).  "[I]n evaluating the reasonableness of handcuffing, a [c]ourt is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Id. (quoting Estmont, 371 F. Supp. 2d at 215) (alterations in original; emphasis removed).

Ms. Valade testified that her handcuffs were too tight and that she so informed Officer Seide "[m]ore than once."  Officer Seide allegedly ignored those pleas by insinuating that Ms. Valade was "being a sissy."   Furthermore, Ms. Valade's testimony, corroborated by photographic evidence and comments in her doctor's April 15, 2009 medical report, evidences at least some degree of injury (albeit perhaps not especially severe) to her wrist.  See Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."); Garcia v. Greco, No. 05 Civ. 9587 (SCR) (JFK), 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) (Though "highly relevant," the "severity of [a] plaintiff's alleged injuries is not dispositive.").  By contrast, Officer Seide offers only conclusory testimony that "[n]o force was used" during Ms. Valade's arrest.

---

[8]   Plaintiffs characterize the alleged sexual assault against Ms. Valade as an act of excessive force.  While both violations are held to implicate the Eighth Amendment, the Court will address Ms. Valade's sexual assault claim as distinct from her excessive force claims.

The Court is not able to hold at this stage that "no reasonable factfinder could conclude that [Officer Seide's] conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123. Accordingly, summary judgment as to this excessive force claim is denied.

### ii. Officer Seide's Alleged "Shoving" of Ms. Valade into the Police Car

Ms. Valade testified that, during her arrest, Officer Seide was "roughing her" and shoved her at least twice as she was transferred to the back seat of the police car. As a result, Ms. Valade claims to have sustained a large bruise on her back that lasted six weeks, an allegation corroborated once again by photographic evidence and a doctor's medical report. The Second Circuit has deemed summary judgment inappropriate in similar circumstances. See Robison, 821 F.2d at 923-24. Accordingly, Defendants' motion as to this excessive force claim is denied as well.

### d. Alleged Sexual Assault

Ms. Valade alleges that, while unconscious, she was sexually assaulted. (Opp'n 12.) To support this claim, Ms. Valade testified that, upon waking up in police custody, she experienced an aching "rectal pain" and noticed blood and a "milky white," "slimy," "jelly-like," "alien" substance in her underwear. As she was unconscious, Ms. Valade is unable to provide further support for her sexual assault claim:

> Q.    . . . [Y]ou stated that you believed that you were sexually assaulted while in police custody; is that correct?
> A.    Yes. . . .
> Q.    I'm just trying to make for my own understanding as to the contours of your allegation that you were sexually assaulted while in police custody. Are you claiming someone raped you while you were in custody?
> A.    I don't remember what happened. All I know is the result was that there was blood and jelly like substance and I was in pain.

(G. Valade Tr. 229-30.)

Defendants argue that summary judgment should be entered because Ms. Valade "has no memory of what transpired" and therefore "cannot articulate the manner in which she was assaulted."   (Reply 7-9.)   A victim's incapacitation, however, is a common aspect of sexual assault cases.   See Patricia J. Falk, Rape by Drugs: A Statutory Overview and Proposals for Reform, 44 Ariz. L. Rev. 131, 134, 142 (Spring 2002) (noting that "a victim who has become intoxicated by alcohol . . . by self-administration . . . involve[s] a common form of victim incapacity to consent" and that "a substantial number of cases, dating back to the nineteenth century, involve [sexual assaults of] intoxicated persons").

Defendants also argue that there is "no suggestion" of Officer Seide's personal involvement.   Although it is true that there is no direct evidence in the record that Officer Seide personally assaulted Ms. Valade, the record evidence does indicate that Ms. Valade was under Officer Seide's direct custodial supervision from the time of her arrest until she was awakened in her holding cell.   See Ledger v. City of N.Y., No. 09 Civ. 2227 (ARR) (LB), 2011 WL 3206878, at *4-5 (E.D.N.Y. July 27, 2011) (where "there [wa]s no evidence that anyone other than [two officers] w[ere] on the scene," they were "both rational candidates for beating plaintiff") (distinguishing Husbands ex rel. Forde v. City of N.Y., 335 Fed. App'x 124, 129 (2d Cir. 2009) (summary judgment proper where, though arrestee was "kicked . . . in the head," discovery did not reveal who kicked him and no officer present was a "rational candidat[e]" for having used alleged excessive force)); cf. Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007) ("Apparently, the district court agreed with the officers that because Velazquez did not see who beat him, if anyone did, there would be no evidence at trial from which a jury might assign liability for the beating.   This is not the law.   Were this the law, all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a

bag over the arrestee's head and administer the beating in silence.  Velazquez alleged that two officers were present when he was subjected to a beating while handcuffed.  He has named the two officers in his complaint.  They have admitted being present.  Velazquez's . . . testimony that two officers were present, coupled with their admission that they were present, permits the jury, if it believes that he was beaten, to find that both of the officers administered the excessive force.").

This case is not unlike Doe v. Saraceni, No. 3:05 Civ. 415 (SRU), 2007 WL 1521580 (D. Conn. May 24, 2007), in which that plaintiff too alleged to have been sexually assaulted by a police officer.  In denying the officer's summary judgment motion, the court explained:

> Saraceni, without citing a single case or statute, argues that Doe cannot make out a prima facie case of sexual assault because, in effect, she blacked out and therefore cannot testify to the particular acts she claims Saraceni committed. . . .
>
> [A] reasonable fact-finder could find in her favor on her claim for sexual assault against Saraceni.  Doe has clearly put forward enough evidence from which a reasonable fact-finder could conclude that she was unable to communicate her unwillingness to have sexual contact with Saraceni, that is, she asserts that she blacked-out.  Because Doe blacked-out, it would obviously be difficult for her to testify directly about the particular acts she claims Saraceni performed.  Still, a fact-finder is permitted to consider circumstantial evidence, and indeed, an entire case may be built upon circumstantial evidence.  Here, Doe blacked-out. She woke up the next day wearing no underwear, and she noticed blood on the toilet paper when she went to the bathroom. . . .
>
> Ultimately the question whether a sexual assault occurred is a question for the fact-finder, to be determined after considering all of the evidence and in particular, after making judgments based on credibility and demeanor.  In a case such as this, credibility is particularly important, and thus must be resolved at trial, because I am not permitted to judge credibility at summary judgment.

Id. at *5-6.

Based on the evidence before the Court, it is skeptical that Ms. Valade will ultimately prevail on her claim that she was sexually assaulted while in custody.  Having drawn all reasonable inferences in Ms. Valade's favor, however, the Court is unwilling at this time and in

the context of a summary judgment motion, to rule as a matter of law that no reasonable jury could determine that Ms. Valade—who has testified that she woke from unconsciousness while in custody experiencing anal pain, and noticing the presence of blood and an "alien," "jelly-like" substance in her underwear—has sufficiently established her claim.  Therefore, as in <u>Saraceni</u>, summary judgment as to this claim is denied.

### e.  Malicious Prosecution

Malicious prosecution under § 1983 requires a plaintiff to establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; (4) actual malice as a motivation for defendant's actions; and (5) a post-arraignment seizure.  <u>Jocks v. Tavernier</u>, 316 F.3d 128, 136 (2d Cir. 2003).  "Because accusers must be allowed room for benign misjudgments, . . . the law places a heavy burden on malicious prosecution plaintiffs."  <u>Rothstein v. Carriere</u>, 373 F.3d 275, 282 (2d Cir. 2004) (citation and internal quotation marks omitted).

Mr. Valade[9] cannot establish that Officer Seide lacked probable cause for commencing the action against him or was motivated by actual malice in doing so.  As explained above, probable cause existed at the time of Mr. Valade's arrest, and Mr. Valade has introduced no evidence suggesting that Officer Seide became aware of facts that negated probable cause prior to signing the criminal complaint shortly thereafter.  <u>See</u> <u>Coleman v. City of N.Y.</u>, 177 F. Supp. 2d 151, 158 (S.D.N.Y. 2001) ("Because no new facts came to light after the arrest and before the prosecution was initiated that would exonerate [p]laintiff, [d]efendants had probable cause to initiate the prosecution against him.")  In any event, the record contains no evidence that Officer Seide's actions were motivated by actual malice.

---

[9]    Plaintiffs concede that Ms. Valade may not maintain a malicious prosecution claim because she accepted an adjournment in contemplation of dismissal.  (Opp'n 8.)

Accordingly, summary judgment as to Mr. Valade's malicious prosecution claim is granted.[10]

## 2.  City of New York

The Valades assert a claim against the City of New York pursuant to <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  This claim is deficient because there is no evidence that the violation of any constitutional rights "resulted from a municipal custom or policy."  <u>Costello v. City of Burlington</u>, 632 F.3d 41, 49 (2d Cir. 2011) (quotation omitted).  Plaintiffs rely on <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113 (2d Cir. 2004), for the suggestion that "both a single action and single instance of deliberate indifference can provide a basis for municipal liability."  (Opp'n 14.)  That suggestion clearly is misplaced here.  The plaintiffs in <u>Amnesty</u>, anti-abortion protesters, submitted evidence permitting an inference that the police chief—who had final policy-making authority for purposes of <u>Monell</u> liability—"himself witnessed (and perhaps encouraged) the unconstitutional conduct, and that the conduct was so blatantly unconstitutional that [his] inaction could be the result of deliberate indifference to the protesters' constitutional rights."  <u>Amnesty Am.</u>, 361 F.3d at 128.  Here there is no evidence that the allegedly unconstitutional conduct was witnessed or encouraged by anyone at the policy-making level.  Accordingly, Plaintiffs' <u>Monell</u> claim is dismissed.

## 3.  New York City Police Department

The law is clear that the New York City Police Department is not a suable entity.  <u>See</u> N.Y.C. Admin. Code & Charter Ch. 17 § 396; <u>Ximenes v. George Wingate High</u>, 516 F.3d 156,

---

[10]    Plaintiffs have conceded that each of the state law claims in their Complaint are time-barred, save for Mr. Valade's malicious prosecution claim.  (Opp'n 14.)  For the reasons discussed above, that claim is now dismissed as well.  <u>See</u> <u>Jocks</u>, 316 F.3d at 134 ("Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law.") (citation and internal quotation marks omitted).

160 (2d Cir. 2008) ("Section 396 of the Charter has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued."); Jenkins v. City of N.Y., 478 F.3d 76, 93 n. 19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City."). Accordingly, Plaintiffs' claims against it are dismissed.

### 4.   John and Jane Doe Defendants

As noted above, the Complaint names, in addition to Officer Seide, ten unidentified "Doe" police officers as Defendants.  "Using 'Doe' in place of specifically naming a defendant does not serve to sufficiently identify the defendant."  Kearse v. Lincoln Hosp., No. 07 Civ. 4730 (PAC) (JCF), 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009) (citation and internal quotation marks omitted).  Where a plaintiff "has had ample time to identify" a Doe defendant but gives "no indication that he has made any effort to discover the [defendant's] name," the plaintiff "simply cannot continue to maintain a suit against" the John Doe defendant.  Id.  In this case, Plaintiffs did not seek leave to amend their Complaint to add additional officer defendants. Accordingly, the ten "Doe" defendants are dismissed from the action.  Watkins v. Doe, No. 04 Civ. 0138 (PKC), 2006 WL 648022, at *3 (S.D.N.Y. Mar. 14, 2006) (dismissing without prejudice claims against "Doe" defendants where "despite having the full opportunity to conduct discovery, plaintiff has not yet identified and served [those] defendants").

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. The Clerk of Court is directed to terminate the motion pending at docket number thirty-five (35). A conference call is scheduled for June 11, 2013 at 2:45 p.m. In advance of the call, the parties shall confer as to how they propose to proceed.

SO ORDERED.

Dated:      June 6, 2013
            New York, New York

                                        _____
                                        Ronnie Abrams
                                        United States District Judge

21